3m 138
90  392

3bm138
f133  846

CHANCERY.    The City of Louisville *vs* Bank United States *et al.* John Rowan *vs* Same.

WRITS OF ERROR TO THE LOUISVILLE CHANCERY COURT.

*Case 45.*    Construction of contracts. Bank United States. Boundary.

*October 11.*    CHIEF JUSTICE ROBERTSON delivered the opinion of the Court.

Origin of Louis-
ville and the
character of this
controversy.

THIS is a very interesting suit in Chancery, involving many points of controversy arising from a contract between *John Rowan* and the trustees of the former town,

now city of *Louisville*, respecting the ground between water street in said city and low water mark on the Ohio river.

CITY OF LOUISVILLE
vs
BANK U. S. *et al.*
&c.

In 1780 the Legislature of Virginia authorized the location of Louisville on 1000 acres of escheated land which had been granted to Dr. *John Connelly* in 1773 by George the 3rd. The boundary of *Connelly's* patent, mathematically defined according to the literal import of its calls, embraces a portion of the Ohio river as far as a hole in a rock in Corn Island shoal: and the town, as authorized and actually located, would seem to be co-extensive with the actual boundary of the said 1000 acres. In 1784 the Legislature of Virginia authorized certain Commissioners to sell the unappropriated grounds in the town as laid off under previous enactments. And, in 1787 those Commissioners sold and conveyed to John Campbell the slip between Water street, near and parallel with the Ohio and the river boundary, as designated in Connelly's grant. By intermediate conveyances, Campbell's interest, as thus acquired, was transmitted to various persons, among whom John Rowan had acquired his title to most of the slip from Gray's wharf, near the mouth of Bear Grass, to the lower end of the town. In June, 1825, the said Rowan and the trustees of Louisville executed a deed, *inter partes*, whereby he conveyed to them and their successors, corporate or unincorporate, all his interest in the said slip between Water street and *low water mark*, on considerations, conditions, and stipulations, substantially as follows:

1. The trustees were, "*as dispatchfully* as (might) be convenient, to wharf and pave the said slip," (with the permission to take rock for that purpose from the bed of the river)—and were also "to levy tolls on the wharfs shores, and landing places, and after paying the expenses of collecting the tolls," were to pay to Rowan or his representatives, "in all time to come, one half thereof" semi-annually:

*The stipulations between John Rowan and the trustees of Louisville.*

2nd. The trustees having previously, for $700, bought from one Pearce, his claim to 420 feet on the river between 7th and 8th streets, agreed to "*bring*" it "into *joint stock*," wharf and pave it, and divide "the profits"

City of Louis-
VILLE
vs
Bank U. S. *et al.*
&c.

equally, deducting from Rowan's share of profits the said $700, which he agreed thus to refund to them on account of their said purchase:

3rd, "The remainder of the said slip not owned by "either party, (was) to be purchased, wharfed, and paved "at joint expense, and the profits equally divided after "paying the purchase money, and expense of wharfing "and paving, and of collecting" tolls—Rowan's portion of cost and expense "to be deducted out of his moiety of "the profits as they (should) become due:"

4th, The trustees or their successors *might*, whenever they should deem it expedient, "purchase Gray's wharf at joint expense"—"the money collected as tolls from "any or all of the wharfs to be appropriated to the pay- "ment of the purchase money, and the *tolls* from said "wharf to be equally divided, first paying the expenses of "collection."

5th, If Rowan should ever "desire to sell his equal interest in the aforesaid slip and wharfs, or any part or parts thereof," he should give the trustees or their suc- cessors "the refusal at the sum asked:"

6th, That the trustees and their successors should "have "*the right* of making wharfs with stone or wood, or both, "as they (might) think most expedient, and at such time "as (might) be convenient and requisite so as to meet "the demand for them, as well as the *exclusive previlege* "of assessing, levying, and collecting the tolls on all "boats, rafts, &c. To deepen the river or basin in front "of said slip and wharfs, when erected, and to keep the "harbor clear of all obstructions, so as to afford, at all "stages of the water, a safe and commodious anchorage "for vessels of every kind, and to do and perform *such* "*other things as shall be necessary for the interest of both* "*parties.*"

7th, Should the trustees or their successors ever pur- chase the residue of the slip to the upper boundary of the town, on the Ohio or Bear Grass, or both, the pur- chase was to be at the joint expense and to enure to the joint benefit of the parties to the deed of 1825, "*agreea- bly to the foregoing agreement and stipulations.*"

8th, If the trustees or their successors should ever make any other than the stipulated use of the ground or any portion thereof, conveyed by Rowan, he was to have "*one half of the advantage* and *profit thereon.*"

9th, The trustees were to furnish Rowan, semi-annually, if he should require it, with a full, fair, and correct "account of the *expense and profits of the premises.*"

On the 10th of January, 1826, John Rowan, by his attorney in fact, James Guthrie, sold and conveyed to the Canal company, a site for the Louisville and Portland Canal, from the Ohio river below 9th street, to Portland.

Prior to August, 1831, the city of Louisville had purchased the entire slip of ground not previously conveyed to the trustees by Rowan, on the Ohio river and Bear Grass, within the limits of the old town of Louisville.

On the 23d of August, 1831, Rowan mortgaged to the Bank of the United States, as a security for $25,000, all his interest in the wharf from the upper end of the Canal to the upper line of Louisville, and described that interest as "*an undivided moiety of said wharf.*" Afterwards, October 12, 1831, by a conveyance purporting to be a gift, he conveyed one half of his said interest to Lytle and others, children of his deceased brother-in-law, Gen. Wm. Lytle, subject to the said mortgage: and, on the 22d February, 1838, these last alienees, (Lytle &c.) conveyed the same interest to the city of Louisville, subject expressly to one moiety of said incumbrance.

Neither Rowan nor the Bank having received from the city any money on account of profits, otherwise than indirectly, in appropriations, to incidental expenses, and to purchases as stipulated for in the deed of 1825.

The Bank, in 1836, filed a bill in Chancery against Rowan and the city, for a foreclosure of its mortgage, and a sale for making its debt.

And Rowan filed a cross bill against the city, concurring in the Bank's prayer for relief.

The city resisted any decree against it, insisting: 1. That the slip claimed and conveyed by Rowan, being originally dedicated as public ground, was not vendible when conveyed to Campbell in 1787, and it being therefore the property of the city and not of Rowan when he attempt-

---

CITY OF LOUIS-
VILLE
*vs*
BANK U. S. *et al.*
&c.

Rowan's conveyance of a site for the Portland Canal.

Purchase by the city of the ground below Beargrass, not conveyed by Rowan.

Rowan's mortgage to the Bank U. S., and conveyance to Lytle's heirs.

Bill and object.

Rowan's answer and cross bill.

Answer of the city.

City of Louis-
ville
vs
Bank U. S. et al.
&c.

ed to convey it in 1825, nothing of value passed by that conveyance to the city, and consequently a Court of Equity should not enforce any of the stipulations in the said contract of 1825—and 2d, That no profits had accrued beyond the amount of the legal charges that had occurred under the deed of 1825.

But the Chancellor decided that upwards of $32,000 remained due from the city to Rowan and the Bank, and foreclosed the mortgage, and virtually decreed the absolute sale of the city's interest in the entire slip of ground embraced in the contract of 1825.

*Decree of the Chancellor.*

Both the city and Rowan seek the reversal of that decree, which we will now revise on such of the multitude of points urged in argument on each side, as we deem worthy of grave consideration.

The right of the Bank to maintain its suit is a preliminary question which meets us at the threshold. That right is denied on two grounds—1st, The expiration of the prolonged charter of the Bank in 1838—and 2d, The alledged non-assignability of the interest mortgaged and sought to be enforced. The first ground is unsustainable for three reasons :—1st, The expiration of the corporate being, could not have destroyed the beneficial interests and rights of the natural persons who had, for convenience merely, been constituted one legal person with a single name : And consequently, as the expiration of the charter could have affected the form of remedy only, and not the essence of the right, and as this suit was pending in the corporate name when the corporation ceased to have legal existence, a Court of Equity ought not to have abated the suit for the impracticable purpose of a formal new suit or revivor in the individual names of the multitudinous corporators. 2d, An act of Congress of the 2d of March, 1838, one day before the expiration of the prolonged charter, provided that suits in the name of the Bank of the United States then pending should not abate in consequence of the legal death of the corporation :— And, as that enactment was only a virtual continuation of the corporate existence for the purpose of prosecuting all pending suits, its constitutionality and effectual operation ought not to have been doubted. And 3rd, Row-

*The Bank of the U. S. by her corporate name may maintain suits to recover her rights, instituted before the expiration of her charter, on the 2d March, 1838.*

an's cross bill, praying for a decree in favor of the Bank as his mortgagee, authorized any decree in its favor to which he himself could have been entitled, to the extent of the interest secured by the mortgage.

City of Louis-
VILLE
vs
Bank U. S. et al.
&c.

The second ground of objection to the suit is equally untenable. Rowan had a beneficial interest resulting as the fruit of his conveyance, and which, being enforcible by bill in Chancery, was, of course, assignable in Equity. And even had that interest not been transmissible by contract, still Rowan's cross bill authorized a decree in favor of the Bank, if he would have been entitled to one him-self in the absence of any available mortgage.

This suit also maintainable for the benefit of the Bank on Row-an's cross bill.

The next objection to the decree is still more radical, as it denies that Rowan himself has, or ever had, or can have any available interest under the contract of 1825; because, as argued, the ground claimed by him and embraced by his conveyance to the trustees, was never private property since the establishment of Louisville, and therefore, as his assumed title was the only consideration of that contract, a Court of Equity ought not to enforce against the city, covenants founded on a conveyance to it of its own exclusive public property, executed and accepted through mistake, as to its pre-existant rights.

This we shall also consider as a preliminary point.

Perhaps the calls in the Royal grant to Connelly may, as always since claimed, constructively include, by the boundary actually designated, a portion of the river as far as a certain rock on Corn Island; but whether this be the actual boundary or not is, in our judgment, a speculative question, altogether immaterial in this case. Nor can it be essential to any interest now litigated, whether—supposing the margin of the Ohio to be the actual boundary—the grant constructively extended the patentee's right to the bed of the river as far as the middle thereof, (*ad filum medium aquæ*,) subject to the public right of navigation and other uses. Such a constructive extension of private right undoubtedly results from a grant of land bounded by a river not navigable. And there can be no doubt that, in England, according to the ancient common law, a river was not deemed navigable in the technical sense, where the tide did not ebb and flow. But whether

Qu.—Does the grant of land to the margin of a river, where no tide ebbs and flows give a constructive right to the land covered by the water to the middle of the stream ?

CITY OF LOUIS-
VILLE
vs
BANK U. S. et al.
&c.

that doctrine should now be applied to such American rivers as the Ohio and Missouri, is an important question never definitely settled by this Court. And we shall not consider it now—because, were it admitted that the ancient doctrine in England is not applicable here to such a stream as the Ohio, still the grant to *Connelly* carried his private right to low water mark—and that is as far as Rowan conveyed to the trustees. The elaborate agreement made in this case, as to the actual extent of Connelly's patent, and as to arcefinious boundaries and riparian rights of property resulting therefrom, will not now be further considered.

The sale by commissioners under an act of the Legislature of Virginia, in 1787, of the land between the town of Louisville and the Ohio river, to Campbell, and the acquiescence in that sale ever since, and their purchase from Rowan of that title, held to estop the city from denying Rowan's title.

*Connelly* certainly owned the ground to low water mark, and the town of Louisville, as originally laid out and established, was in our opinion, as certainly bounded by the same line. Nor can we doubt that, though the cross streets, as designated on the original plat of the town, did not appear to cross water street and extend in fact to the river, yet nevertheless, such extension, prospectively, was considered a natural and necessary consequence of the location of the town at such a point and on such a river, and that the interjacent slip was intended for public use. The act of Assembly under which the sale of it was made to Campbell, might perhaps, literally import an authority, nevertheless, to sell it. But even if there had been no such authority, the sale, as made, seems ever since, until recently, to have been acquiesced in, and sanctioned by implied recognitions often repeated by the town and city of Louisville. Such long acquiescence and multiplied recognitions not only conduce persuasively to establish the validity of the original sale, but should now operate as an estoppel.

The objection which we are now considering must, therefore, be disregarded. The question as to the original character and destination of the slip may, however, be material in the consideration of another point which will be hereafter noticed.

The other principal questions to be decided arise out of the terms of the contract of 1825, and therefore they will be numerically considered under one comprehensive

classification, depending on the true interpretations of that contract.

I. In considering the import and object of the entire contract of 1825, the first question arises from so much of it only as applies to the slip conveyed to the trustees by Rowan. One of the considerations, and doubtless the chief one, for that conveyance was the agreement by the trustees to wharf and pave that slip, levy tolls, and account to Rowan for one half of the proceeds "in all time to come"—and here the matter of controversy is, whether Rowan's share of tolls is liable to contribution for necessary renovation or repairs of the wharfs and pavements upon this slip, or for any other incidental expense than that of collection merely. And on this branch of the case, we do not concur with the Chancellor, who decided that all necessary expenses, excepting only that of collecting tolls, whether incurred in the repair or renewal of pavements or otherwise, devolved on the city alone, and that no other portion of expense, however necessary to the common interest of the parties, can ever be justly chargeable to Rowan's conventional half of the tolls. The Chancellor's interpretation of this part of the contract, accords with the letter of one of its stipulations; but it does not, in our judgment, either correspond with the presumed object and effect of its other stipulations or harmonise with the intention of the parties as deducible from all the provisions of the whole contract, considered as one entire agreement. The trustees agreed to wharf and pave, "*as dispatchfully*" as convenient; and that clearly imports a wharfing and paving once only, and in the first and no other instance. The expense of *that operation* was capital on one side, and the value of Rowan's title, as conveyed to the trustees, was capital on the other side. The trustees undertook to add nothing to the capital thus agreed to be furnished on their part; and, as soon as the wharfing and paving were once completed and tolls levied, the entire capital had been advanced by both parties. When the trustees had once wharfed and paved according to contract, had they not fulfilled their whole undertaking as to wharfing and paving? Did they undertake to re-pave, or to renew worn-out pavements—or even to

The contract should be construed by taking into view all its provisions.

City of Louis-
VILLE
vs
Bank U. S. et al.
&c.

repair dilapidations? We think not. They only agreed to pave "*as dispatchfully*" as convenient. And, when they had once completed the paving "as dispatchfully" as convenient, they had performed all that they undertook or were bound to do, as to the wharf and pavement. If then, as seems already to have been the fact, the mutual interest of the parties should require a reparation or re- newal of the pavement, or of any portion of it—as neither party has undertaken to do this as a portion of capital or otherwise, and as, when done, it must enure to the use and benefit of each party equally, it must, especially if done with the consent of all concerned, be deemed an in- cidental expense, a consequential joint burthen, charge- able on the profits of both parties alike. If the city should refuse to repair or renew, at its own exclusive expense, dilapidations resulting from ordinary ware and tare or otherwise. without its fault, could Rowan complain of a breach of any contract express or implied, or justly claim any damages for illegal and injurious delinquency?

These considerations conduce to the presumption that one half of the "*tolls*," as expressed in this first stipula- tion, was intended, as a matter of course, to be charge- able with contingent burthens not specifically provided for, and virtually, therefore, means one half of the *profits* arising from tolls. And this deduction is fortified by other considerations.

1. The stipulation concerning the optional purchase of Gray's wharf provides, in the like terms, for a division of one half of the "*tolls*" after paying one half of the ex- penses. And can it be believed that the parties intended that, if the city should purchase that wharf at joint ex- pense, advancing the whole price of purchase and waiting with Rowan for his moiety—all incidental expenses of repairing and even of renewing the pavement or sustain- ing and improving the wharf, were to devolve on the city alone? Such an interpretation would be obviously incon- sistent and unreasonable. The trustees did not undertake to buy Gray's wharf—the purchase of it, therefore, was no part of the consideration to Rowan, of his sale of the slip claimed by him. There is no specific provision for repairs, or renewals, or other necessary expenses, unless

"*the expense of collection*" embrace them or some of them. If, therefore, Rowan has not expressly stipulated for such repairs, renewals, or other incidental expenses, neither did the city. Such expenses must enure to the equal benefit of both parties, by improving and making more valuable their joint stock; and, by necessary implication, the burthen must be joint. Why should the city have agreed that, if it should ever purchase Gray's wharf, it would not only advance the whole price, but, at its own expense, forever repair, preserve, and improve the wharf, and always account to Rowan for one half of the "*tolls.*" There could have been no motive for such an agreement; and we must presume that, had the city understood that such would be the unequal effect of its purchase of Gray's wharf, it would never have elected to make it. But, as that wharf was already well paved, the parties contemplated the tolls as produced by it in the condition in which it then was, and supposing, as a matter of course, that if repairs, alterations, or renewals should ever become necessary or useful to their common interest, the expense of them would also be common; they made no specific stipulation for such contingencies; and neither of them undertook or intended to be bound to make any such improvement or to bear the entire burthen of the expense of them when, if ever, they might become necessary. So much of the slip as belonged to neither party, was, by the third stipulation, to be bought, wharfed, and paved at joint expense and the "profits" equally divided. All the motives for that stipulation apply equally to that concerning Gray's wharf, so far as profits are concerned. And the only reason for not using the term profits, in the latter, must have been the fact, that the wharf and pavement were completed and Rowan would have to contribute nothing on that account. Similar considerations are equally applicable to the effect of the first stipulation as to Rowan's half of the "tolls" on the slip conveyed by him, as soon as the city had *once* wharfed and paved it.

2. The express stipulation that Rowan should give the city the pre-emptive right, if he should ever determine to sell his interest, describes it as "his *equal* interest in the aforesaid slip and wharfs." This is a direct acknowledg-

CITY OF LOUIS-
VILLE
vs
BANK U. S. et al.
&c.

ment by him that his interest, as to proceeds, was to be the same in the whole and in every part—and that, as it was not greater than that of the city, but exactly equal to it, consequently it could not be greater than one half of the profits, after deducting all proper incidental expenses, except such as were otherwise specially provided for.

3. The stipulation that, if the city should ever convert the slip to any other use, Rowan should have "one half of the advantage or *profit* thereon," implies necessarily, that his interest, in lieu of which that contingent substitution was provided, was only half of the "advantage or profit" of the slip, when once wharfed and paved.

4. The ninth stipulation imports that Rowan was to be entitled to only one half of the *profits* accruing from the slip conveyed by him, and was to be chargeable with one half of the incidental expense after the completion of the wharfing and paving of it—for, succeeding all the other stipulations, it necessarily refers to and embraces the first as well as the others; and consequently, as it provides for a semi-annual report to Rowan "of the *expense* and *profits* of the *premises*," it implies that he will be entitled to one half only of the *profits* resulting from the contemplated use of the slip.

5. The seventh stipulation also clearly implies that as to proceeds, the parties were to be equally interested to the whole extent of their common interest, otherwise who could tell how to interpret or apply the agreement that any future purchase to the upper boundary of the town, should enure to the *joint* benefit of the parties "agreeably to the *foregoing* agreement and *provisions?*" This stipulation alone would tend strongly to indicate that the interests were "*joint*" and equal throughout, with the exception of some apparent inequality in contributions of capital.

6. *Rowan's* first answer in this case is confirmatory of the foregoing considerations and conclusions; for, in that he says—"He charges that the said trustees of Louisville "and their successors have, as he has been informed and "believes, obtained the possession, and either the title or "the right thereto, of all the wharf *from the upper boun-* "*dary of the city*, *down Bear Grass* and the river, *to the* "*mouth of the Canal*—to one full half of the annual

CITY OF LOUIS-
VILLE
vs
BANK U. S. et al.
&c.

"PROFITS *of which,* to be paid semi-annually, this re-"spondent was, as he believes, entitled when the mort-"gage was executed by him to the complainants." He here claims *profits* only, and makes no discrimination, in that respect, between the slip conveyed by him to the trustees, above the mouth of the Canal, and other portions of the joint interest. And, in his mortgage to the Bank, he describes his interest as "being one undivided moiety of the wharf," from the upper boundary of the city to the mouth of the Canal, thus indicating that his title to profits, like that of one of two equal partners, was a right to one half only.

7. Although the fund for ultimate distribution between the parties, is in two of the stipulations characterised as "the *tolls,*" and in all others as "the *profits,*" nevertheless, even if these different terms were thus used considerately and for the distinct purposes indicated by the literal and specific import of each, there may have been an apparent reason for that distinction perfectly consistent with the presumption, that incidental expenses and consequential burthens, not specially provided for, were to be borne by both parties equally, in every class of cases embraced by the conveyance, and to each of which that deduction would apply with equal force. Such expenses and burthens were not specifically provided for in those cases in which "profits" were to be divided, any more than in those in which "tolls" were to be distributed—and consequently, when Rowan's portion of tolls was to be charged with his share of capital advanced, or to be advanced for him by the city, or with interest on it or any part of it, the distributable fund is called "profits," meaning the residue of tolls after deducting those charges on them; but, when as in the first stipulation, the capital was advanced, or to be advanced by each party before tolls could accrue, or when, as in the other stipulation as to Gray's wharf, the capital was to be advanced for each equally out of their common stock previously received from tolls, the fund for distribution is called "tolls," because nothing was to be deducted from them on account of capital or interest thereon.

This, we think, was the reason why those different terms were employed, if indeed they were intended to have

City of Louis-
VILLE
vs
Bank U. S. et al.
&c.

a different import. And on this view, equal liability for incidental burthens for the joint benefit of the parties, was implied as much in those cases in which "tolls" were to be divided, as in any others, and was considered as a matter of course in all cases, in no one of which specific stipulations to that effect were made or deemed necessary. However, if the use of those different terms be not ascribable to the distinctive circumstance just adverted to, we should apprehend that, either from inadvertance or want of precision, they were used synonimously, meaning in each case the net proceeds *arising from "the tolls."*

8. But whatever might be the proper deductions from the foregoing considerations, there is one provision in the contract which, according to our interpretion of it, would alone be sufficient to show that Rowan's share of tolls, is chargeable with half of all necessary or proper expenditures which the trustees did not agree to defray as a portion of their capital. We allude to the comprehensive and cautionary provision by which the trustees reserved the right "to do and perform such other things as shall be necessary for the interest of both parties." We can neither perceive nor imagine any plausible motive for this reservation, unless the trustees intended by it to show, undeniably, that Rowan's share of tolls should, in every case, be contributory to the expense of all repairs, improvements, and other incidental burthens necessary for the interest of both parties. As Rowan had parted with all his title to the ground, why else did the trustees expressly reserve the power to do what, without any such stipulation, they would have had the power to do? This entire reservation will hereafter be noticed more particularly for another and more comprehensive purpose. For the present, we will assume that we have just given to it its true effect. And, on this hypothesis, as the reservation applies to every precedent stipulation, there can be no doubt that, even if the first of them, by itself, might import that Rowan was, in all events, to have one half of the tolls as such, still that stipulation being qualified by the last, his share of tolls is nevertheless reduced to profits, by being subjected to contribution to all expenses incur-

red by the city, as his trustee, in promoting, according to its reserved right, the common interest. Moreover, and consequently, may not the expense of collection itself even, mean "*all burthens incident and contributing to the obtaining and securing of tolls.*"

CITY OF LOUIS-
VILLE
vs
BANK U. S. *et al.*
&c.

We are therefore of the opinion that, if the joint interest of the parties required repairs or other improvements, or imposed any other incidental burthens on the slip conveyed by Rowan, (and which the other party had not agreed to charge to itself alone,) that party, holding the title and the discretion as trustee for the mutual benefit of both, had a right, under the contract of 1825, to make disbursements for all those purposes out of the tolls produced by that slip, and that Rowan is consequently entitled to only one half of the proceeds, after deducting all such proper charges.

When the one party deeded to the other one half the ground on which the latter was to construct and pave a wharf, and the profits or tolls were thereafter to be divided, all repairs are improvements, & repairs after constructed, to be at joint expense, out of the profits.

But so far as any such charges may have resulted from the caprice or negligence of the other party, Rowan should not be made contributary.

II. The Chancellor decreed that Rowan is liable for one half of the cost of wharfing and paving the slip of 420 feet owned by the trustees at the date of the contract, and which they brought "into joint stock," covenenting to wharf and pave it, and then to divide the profits, deducting from his share of profits, $700 which they had paid to Pearce for his claim conflicting with theirs; and, in this construction of that portion of the contract of 1825, we do not entirely concur.

As the amount paid for the relinquishment of Pearce's conflicting claim was to be reimbursed out of Rowan's share of profits, this slip of 420 feet was to be held by the trustees as joint stock; but the covenant by the trustees to wharf and pave it, is without any express intimation that half the cost of that operation, was to be reimbursed out of Rowan's portion of tolls—and therefore the explicit stipulation that the sum of $700 should be so refunded, implies an exclusion of any portion of the principal expended in wharfing and paving. This implication is fortified by the fact, that in the next sentence, the covenant concerning the purchase and use of other ground, not then owned by either party, expressly pro-

City of Louis-
ville
vs
Bank U. S. et al.
&c.

vides, not only for a reimbursement of Rowan's half of the cost of purchase, but of that also of wharfing and paving, out of his share of the profits.

Our inference therefore is, that it was understood, that Rowan's prospective contribution of $700 out of profits, made him jointly interested in the 420 feet as capital, equally advanced by both parties, and which consequently was not to be considered in estimating profits; but that the profits to be divided should be the net amount of tolls remaining after deducting interest on the sum paid by the trustees for wharfing and paving, and all incidental expenses, and that then Rowan's share of profits,. thus ascertained and resulting, should be retained by the trustees until the $700 had been absorbed and thus reimbursed. And here arises one of the most important questions litigated in this case—and that is, whether Rowan's share of the tolls on other portions of the slip bought by the trustees since the date of the contract of 1825, is chargeable with interest on his half of the cost advanced by the other party. This question depends on the construction of the third stipulation already quoted in this opinion. That stipulation is, in effect, that so much of the slip as might afterwards be bought by the trustees, should be purchased, wharfed, and paved at "*joint expense,*" the profits to be equally divided after deducting that aggregate cost and "the expense of collecting"—and Rowan's half of that cost to be refunded out of his share of profits as they should accrue.

*Agreement that one party may buy at the joint expense of himself and another, and wharf and pave, and out of tolls retain one half of the expense of costs of wharfing, &c., implies that the half of the interest on the necessary fund is to be paid.*

As the trustees advanced all the capital, the term "profits," in this stipulation, imports the net avails after deducting interest on the capital so advanced. And the provision as to the reimbursement of his half of that capital, out of his share of profits, does not affect the mode of ascertaining the profits, but means only that, when profits accrue and shall be properly ascertained, his share of them shall be chargeable with his portion of the advanced capital. until it shall have been thereby absorbed.

This is only a deferred. and contingent payment without any intimation that nothing but principal is to be thus paid by Rowan. When, or whether ever, his half of this

capital would be thus reimbursed, was uncertain—and it would be unreasonable, therefore, to assume that it was not to be chargeable with accruing interest, *and when profits only are to be divided.* Moreover, the purchase, wharfing, and paving, could not be "at joint expense," if the trustees, after advancing all the cost, should be entitled to no interest on Rowan's half of it, and the more especially as it was altogether uncertain when even the principal would be reimbursed. His moiety of the capital is, therefore, chargeable with interest from the time when it was advanced for him by the trustees.

CITY OF LOUIS-
VILLE
*vs*
BANK U. S. *et al.*
&c.

And we are of the opinion also, that if, at any time, there was any balance of Rowan's profits due to him in the hands of the trustees or city, and which ought to have been paid to him, he is entitled also to interest thereon—because the depository of all such balances was his trustee, and doubtless used and made profit out of his funds, if any such were withheld from him. But the Chancellor decided that neither party is entitled to any interest.

The city bound as Rowan's trustee, for interest on any balance of tolls due and withheld from him.

III. The sixth stipulation, as already recited, concerning the deepening of harbors, &c., has been construed by the Chancellor as a mere reservation of an exclusive privilege, which does not entitle the city to any contribution from Rowan, or lien on his share of tolls, for any expense incurred in any such improvement, however necessary to the promotion of his interest. After mature consideration we must dissent, also, from this conclusion of the Chancellor.

This stipulation had, as it seems to us, a two fold object; 1st, to show indisputably that, although Rowan claimed to own a portion of the bed of the river, which might be used as harbors to the extent of the slip conveyed by him, and was jointly interested in the profits, he should have no agency in the levying of tolls, making or altering wharfs, or in deepening the harbors, nor any right to obstruct them, but that the control of all those matters should belong exclusively to the other party: and 2nd, to show also that the city, for itself and as trustee of Rowan, should always have the right and exclusive privilege of doing, for their common benefit, and at their joint cost, whatever might be necessary or useful.

City of Louis-
ville
vs
Bank U. S. et al.
&c

The trustees did not undertake, as any part of their duty, the burthen of deepening or clearing harbors, or of doing any thing else than what had been previously specified, for promoting the common interest. There can be no pretence, therefore, for an assumption that any such undertaking by the trustees or expectation by Rowan, was any portion of the consideration of his conveyance.

It may be true, as argued by the learned Chancellor, that independently of any agreement with Rowan, the city of Louisville, as a qualified local sovereign, might have had a right to deepen the harbors, and keep them clear of obstructions, for the public welfare. But would it be either a legal, logical, or just conclusion, that therefore, the city was either bound or agreed to do all this at its own expense for Mr. Rowan's benefit, and to give him one half of the tolls that might be made in consequence of such improvements? Far from it. On the contrary, as each party, so far as tolls might be concerned, would be equally interested in and benefitted by such facilities to the local commerce, each should bear an equal share of the burthen, and Rowan's portion of the tolls should be contributory. To secure such contribution beyond question, was, in our judgment, one, if not the chief object of the stipulation on this subject. If this were not so, again we might inquire, why was there any stipulation reserving what might, as decided by the Chancellor, have been as well done by the city without any conventional reservation of the right? If the city had authority to deepen and otherwise improve the harbors for the benefit of the public, that fact would tend to the presumption that the express stipulation as to harbors, &c., in the contract of 1825, was intended to show that those improvements might be made by the city, not in its sovereign capacity, for the general welfare merely, but in its character as Rowan's associate in private interest. The stipulation we are now considering applies to all the harbors at all the wharfs, co-extensively with the river·border of the city. A great portion of the ground for those wharfs was, by express contract, to be bought and improved at joint expense. If, when so bought and improved, the river had been too shallow for a harbor at any important point,

CITY OF LOUIS-
VILLE
vs
BANK U. S. et al.
&c.

tolls could not have been well derived from that portion of the wharf. Then, if for the purpose of making it profitable, the city had, by excavation, made a suitable harbor, ought Rowan to claim half the tolls and refuse to contribute to the expense of the work which helped to produce them? Would it not be as reasonable to require him to pay all, as to impose the whole burthen on the other co-partner in the profits? And why was the stipulation made at all as to grounds not owned or claimed by Rowan, and to the control and excavation of which he could have had no pretence of right to object? It must have been made to show that improvements might be made for the common benefit of the parties and at their joint charge, and that the city should have the exclusive right to determine on, and make them. If Rowan should be contributory to the improvement of a harbor at any one point, the contract places him in the same responsible attitude, as to any and every other point. The trustees, in making the contract, thought it prudent to secure the sole discretion as to the time, extent, and character of those improvements, and to exact from Rowan an express stipulation conceding it to them as a co-party in interest, and for the mutual benefit of both parties as co-partners in the profits.

Surely the stipulation that the trustees, or city, may do whatever shall be necessary for promoting the interest of both parties, implies an obligation on Rowan to contribute out of his share of tolls, one half of the incidental expense: and consequently the associate agreement as to deepening harbors, &c., should be entitled to the same interpretation and effect.

The charge made by the city against Rowan's share of tolls for one half of the expense incurred in deepening a harbor and keeping it clean, should, in our opinion, be allowed, so far as the expenditure may have been faithfully and prudently made, with an honest view to the benefit of both parties.

But as to any expenditure which may have been incurred in *experimenting* on Bear Grass point, which was altogether abortive and apparently visionary, Rowan ought not, in our judgment, to be required to contribute any

CITY OF LOUIS-
VILLE
vs
BANK U. S. et al.
&c.

thing, unless he, being apprised of that experiment, as being made for the joint benefit, sanctioned or approved it, either expressly or by his silent acquiesence.

IV. As the city has, under the contract, a great latitude of discretion, it ought not to be held responsible to Rowan for unexpected loss, resulting from the authorized, intelligent, and faithful exercise of that discretion.

But it should levy tolls, in all cases, and should be held liable to Rowan for all voluntary or capricious exemptions of commercial vessels of any kind, or for any purpose.

The contract respecting future purchases, is binding and embraces all the ground since bought by the city on the Ohio and Bear Grass, within the limits of the city as recognized at the date of the contract, including, of course, the point of Bear Grass.

In these particulars our opinion concurs with that of the Chancellor.

V. Rowan does not appear to be liable to the city for his conveyance to Lytle and others—because it purports to be a gift, and there is no proof that it was, in any sense, a sale. He only agreed to give the city a pre-emptive right, if he should ever determine to *sell*. Nor, for the like reason, is he liable for mortgaging his interest to the Bank. This was not, in the sense of the contract of 1825, a sale, but was a collateral security merely.

Nor should he be held responsible for damages for his conveyance to the Canal company, since the date of his deed to the trustees of Louisville. The sale to the Canal company was considered beneficial to the city, was approved by the trustees, and not only purported to pass ground which would never be useful for a wharf, but could not have the effect of passing it at all, without the consent of the trustees or the city.

In all these particulars also, we concur with the Chancellor.

VI. Having thus noticed all the points which we deem worthy of consideration, so far as the rights and liabilities of the parties depend on their contract—we will close this opinion, by a brief notice of the decree itself.

1. In consequence of an essential difference between the opinion of this Court and that of the Chancellor, on several important points, his decree seems to be for a larger sum than, in our judgment, should have been decreed against the city.

2. As already suggested, we are satisfied, that in the original location and plan of Louisville, the strip between Water street and the river was intended to be always kept open for public convenience ; and there is no doubt that the occlusion or even appropriation of it as private property would operate injuriously to the general public, and perhaps ruinously to the local interests of the city itself. It ought never to have been sold. We cannot believe that the Legislature of Virginia ever intended that it should be sold as absolute private property. Having been once dedicated to public use, the trustees, without Legislative authority, would never have had the power to sell the absolute title to any portion of it—and had it not been sold prior *to* the adoption of our constitution, the property holders of Louisville would have been protected in their enjoyment of its easements, even against Legislative power, without making adequate compensation to them in money. It would be almost as reasonable to sell and appropriate, as private property, the river itself, as the ground lining its margin, the occlusion of which would obstruct communication between the city and the river. The object of locating the town on the river, was to enjoy the benefit of its facilities as a highway. To ensure that enjoyment against the conflict of private right, which had been too long recognized to be successfully resisted, was doubtless the chief, and perhaps the sole motive for the purchase of the claim of Rowan and others by the trustees. Those purchases having been made by the organs of the local public, and for its use and benefit, they operated *ipso facto*, as a re-devolution of the entire slip to the city, and a re-dedication of it to the public use—or rather, perhaps, as a removal of the incumbrance which jeoparded the perfect enjoyment of it as public property. And the contract between the trustees and Rowan only subjected the slip to such productive use, as a wharf or otherwise, as might be consistent with the design of its

CITY OF LOUIS-
VILLE
*vs*
BANK U. S. *et al.*
&c.

original dedication, and the presumed purpose of the pur-chases by the town through its trustees.

That right of use for profit, is an incorporeal heredita-ment, on the city's portion of which, Rowan has an im-plied lien as vendor of part of the ground, and as co-partner in the profits of the whole as joint stock. That lien he transferred to the Bank by his mortgage. And consequently, in enforcing the mortgage, either the city's portion of profits might be appropriated through a receiv-er, or its profitable usufruct of the whole or a part, con-sistently with all public rights, might at once, be sold for such a term of years as would produce the amount for which the Bank may have a lien. But, in the event of such a sale, or of the appointment of a receiver, the city's right to prescribe the tolls, justly and in good faith, and to require the wharfs and harbors to be kept in proper condition, would still continue.

The right of the
corporation of
the city of Louis-
ville to levy tolls
and in the wharf,
is not a fee-sim-
ple title, vendi-
ble, but the chan-
cellor can only
operate upon the
profits.
The slip being now public ground—except only so far as the contract with Rowan may require the productive application of portions of it as contemplated by that agreement, and consistently with proper easements to the local and general public—there is no fee-simple title vendible, either by the city itself or the Court, as private property appropriable to private use, free from subservi-ence to those incidental public services. Such a sale, if valid, might frustrate the enjoyment of eminent and in-dispensable public rights.

The Chancellor's decree seems to have contemplated an unreserved sale of the legal title of the city as private property. And, in that respect, it was too comprehen-sive, and was not, in our judgment, authorized.

In remanding the case, it may be proper to suggest, that a re-submission to the master may become necessa-ry for ascertaining, as far as possible, not only the sepa-rate profits of the ground conveyed by Rowan, and of that since purchased, but also other facts important to the rendering of such a final decree, as will be just and consistent with the foregoing principles and conclusions.

If the separate profits, as just indicated, cannot how-ever be ascertained with satisfactory certainty, so far as this cannot be done, the decree must be rendered upon

the basis of consolidated profits and expenditures of one comprehensive joint concern.

The decree is therefore reversed, and the cause remanded for such further proceedings and decree, as shall be necessary and proper according to this opinion.

*Loughborough* for plaintiffs : *Pirtle, Duncan, Owsley & Goodloe* for defendants.