CASE 80—PETITION ORDINARY—FEBRUARY 14.

# Berry vs. Snyder, &c.

APPEAL FROM CAMPBELL CIRCUIT COURT.

1. A sand-bar in the Ohio river is held to be private property, and the owner thereof may maintain an action in the nature of an action of trespass for entering upon and removing sand therefrom.

2. The title of the owner of land binding on the Ohio river, if not excluded by the terms of the grant under which he holds, extends to the middle thread of the main channel of the river, and all accretions belong to the riparian owner, as an incident to his title. This title and these rights are held subordinate to the free and unobstructed public rights of navigation and commerce.

3. Under a Virginia patent, issued before the separation of Kentucky from Virginia, the rights of the patentee vested under the laws of Virginia; and, by the compact between Virginia and Kentucky, the rights and interests of lands so derived are to be determined by the Virginia laws.

4. However the courts of the United States may regard navigation and commerce as the controlling elements in testing their admiralty jurisdiction, and founding this, not upon tide water, but navigation and commerce, yet, in testing the rights of riparian owners, they recognize the common law distinction between tide water and fresh water in its fullest, broadest sense.

5. The English common law recognized the land granted on a fresh water river as extending to the thread of the main channel, unless the words of the grant excluded this, whilst the rule was different on all those rivers, or that part of the river, subject to the ebb and flow of the sea.

STEVENSON & MYERS,　　　　　　　　　　　For Appellant,

CITED—

3 *Kent's Commentaries*, 432 to 434, 427, 428.

9 *Paige's Chy. R.*, 547 ; *Varick vs. Smith.*

*Angell on Highways*, secs. 54, 315, 319, *and* 320.

26 *Wendell*, 404; *Commissioners of Canal Fund vs. Kempshall.*

2 *Washburn on Real Property*, 632, secs. 46 *and* 451.

4 *Hill* (*N. Y.*), 372; *Child vs. Starr.*

12 *Johnson*, 252; *Jackson vs. Larew.*

2 *Barbour*, 126; *Orndorff vs. Steele.*

*Angell on Water-courses, chap.* 1, *sec.* 2, *chap.* 7, *p.* 201.

3 *Cain*, 319; *Palmer vs. Mulligan.*

2 *Cain*, 481; *Adams vs. Pease.*

14 *B. Mon.; Morrison vs. Troutman.*

5 *Wheaton*, 374; *Handley's lessees vs. Anthony.*

1 *Chitty on Pleading*, 175, 176.

1 *Burrows*, 133; *Goodtitle vs. Alker.*

3 *Ben. Mon.*, 443; *Trustees of Augusta vs. Perkins.*

3 *Wallace, U. S.*, 57; *Banks vs. Ogden.*

M. C. JOHNSON,              On same side,
CITED—

*Angell on Tide-water*, *pp.* 61–4, 33, 101 *to* 105, 151 *to* 163.

5 *Wheaton*, 375; 17 *B. Mon.*, 246.

3 *B. Mon.*, 143; *City of Louisville vs. Bank of U. S.*

18 *B. Mon.*, 86; *Easley vs. Easley.*

J. R. HALLAM,              On same side,
CITED—

1 *Chitty's Pleading*, 176.

*Angell on Water-courses, secs.* 53 *to* 59.

2 *Hall's Law Journal*, 307.

11 *Ohio*, 311; *Lamb vs. Ricketts.*

8 *B. Mon.*, 232; *Rowan's ex'rs vs. Portland.*

2 *Wallace* (*U. S.*), 67; *Banks vs. Ogden.*

3 *Kent's Com.*, 432–33–34.

5 *Wheaton*, 285; *Handley's lessees vs. Anthony.*

3 *Ohio*, 497; *Gavitt's adm'r vs. Chambers.*

18 *B. Mon.*, 86.

3 *Greenleaf's (Me.) R.*, 474; *Morrison vs. Keen.*

3 *Scam. (Ills.) R.*, 510; *Middletown vs. Pritchard.*

CARLISLE & O'HARA,                    For Appellees,

CITED—

*Cooper*, 86; *The Mayor of Lynn vs. Turner.*

5 *Taunt.*, 706; *Miles vs. Rose.*

*B. & C.*, 598; *Rex vs. Montague.*

1 *Modern*, 105; 4 *Barn. & Cress*, 602.

5 *Modern*, 107; *Constable Case Rep.*, 326.

*Hale, De Jure Maris, &c., Pars Prima, cap* 4.

2 *McLean*, 376; *Bowman, &c., vs. Wathen, &c.*

12 *Howard*, 443; *Genesee Chief vs. Fitzhugh, &c.*

10 *Wheat.*, 428; 2 *Binney*, 475; 14 *S. & R.*, 71.

9 *Watts*, 228; 8 *Watts*, 434; 2 *Devereux*, 30.

3 *Devereux*, 59; 3 *Iredell*, 281; 5 *Ib.*, 118.

1 *Walker's (Mich.) R.*, 155; 1 *G. Greene (Iowa)*, 348.

3 *Iowa*, 1; 9 *Howard*, 471; 13 *Howard*, 381.

5 *Wheat.*, 375; *Amr. Law Reg., vol.* 1, 357.

*Act of Congress of Feb.* 20, 1811; 2 *Stat. at Large,*
    642; *also* 703 *and* 747.

*Compact with Virginia*, 11 *sec., and Va.. Act, July* 28,
    1791.

*Con. of* 1792, *art.* 8, *sec.* 7.

*Con. of* 1799, *art.* 6, *sec.* 9.

*Con. of* 1850, *art.* 8, *sec.* 9.

13 *Howard*, 415; *Howard vs. Ingersoll.*

14 *John.*, 225; 9 *Porter*, 577; *Hardin*, 258.

2 *J. J. M.*, 160; *Bruce vs. Taylor:*

4 *J. J. M.*, 157; *Fleming vs. Kinney.*

1 *Mar.*, 243; 1 *B. Mon.*, 26; 3 *B. M.*, 143.

14 *B. Mon.*, 367–249; 3 *B. Mon.*, 437; 8 *Ib.*, 232.

9 *B. Mon.*, 201; 11 *B. Mon.*, 163; 6 *Pet.*, 728; *Ib.*, 431.

8 *Dana*, 50 ; 2 *Met.*, 98 ; 18 *B. Mon.*, 289 ; 16 *B. M.*, 172.

3 *Met.*, 2, 18 ; 2 *Met.*, 425, 451 ; 17 *B. M.*, 607.

4 *Dana*, 336 ; 5 *Dana*, 533 ; 1 *Marsh.*, 395 ; 2 *Littell*, 182.

2 *Marsh.*, 222 ; 1 *Dana.*, 14 ; 18 *B. M.*, 86.

5 *Dana*, 534.

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

The appellees being trustees of Jamestown, on the Ohio river, in Campbell county, licensed one Snyder to enter upon the sand-bar in front of said town, and take therefrom sand, &c., to be sold in the market of Cincinnati, on the opposite bank of the river. Appellant claiming to be the owner and in possession of this sand-bar, brought this action in the nature of an action of trespass, for entering upon her said possession.

A tract of one thousand acres was originally granted by patent, dated April 20, 1787, by the State of Virginia, to James Taylor, assignee of George Muse, " beginning at said Taylor's upper corner—buckeye, beach, and sugertree on the bank of the river—*running thence up the river, binding on the same as it meanders,*" nine hundred and sixty-four poles. James Taylor conveyed this land, by deed of March 13, 1788, to George Muse.

Catty Shropshire and Catherine Gregory and her husband, William Gregory, claiming to be devisees of George Muse to this land, by their deed of November 14, 1792, conveyed it to Washington Berry, who took possession of it immediately, and so continued in possession until his death in 1813, a period of over twenty years. His widow, Alice, and his children, continued this possession until 1825, when two hundred and eighty-four and one half acres of the tract, embracing this river line, was assigned

her as dower. For some prudential reason, Mrs. Alice Berry, in 1830, obtained a patent from the State of Kentucky for this land assigned her, bounded by low watermark on the river.

Major James T. Berry, appellant's father, was one of nine children left by their father, Washington Berry; also of their mother, Alice Berry, as heirs-at-law, she having died in 1837.

James T. Berry, by various means, became possessed of the interest of his co-heirs to this land allotted to their mother as dower, and to which she had obtained the Kentucky patent, when, in 1846–7, he conveyed an undivided interest therein to J. M. McArthur and Henry Walker.

Berry and McArthur, however, had, before this conveyance to Walker, laid off the town of Jamestown, and conveyed the land on which it was situated to J. N. Taliaferro, as a trustee, to convey the lots as they should direct. The individual interest of these joint owners was afterwards, by legal proceedings, separated, and this sand-bar assigned to said Berry, who died in February, 1864. He directed a division of his lands by his last will, and this sand-bar was assigned to appellant by the division made in pursuance thereof.

The evidence tends to establish, that when Washington Berry took possession of the land, in 1792, there was then a small tow-head just above where the town is now situated, and that there was a channel between the bar and main bank; that, by the gradual wearing away of this tow-head and accretions below it, this channel has filled up, and that now there is no channel between the sand-bar and bank; and, as this may have been only a change from one point to another of the land of the same proprietor, it might, perhaps, be more strictly called a

reliction; that Washington Berry, and those who claim under him, have had such possession and control of this sand-bar as its nature permits, it being uncovered by water from eight to nine months in the year, but so deeply covered during the winter and rainy seasons as to often admit the largest and heaviest laden steamers plying on the river to pass over it.

The evidence further indicates that the original proprietors, for the purpose of enhancing the sale of the lots, licensed the citizens or trustees to use the sand for building purposes in said Jamestown, and that the citizens have so used it at will without hindrance, and that even country citizense have frequently gone on it and obtained sand for their purposes; but that Major Berry, and those under whom he claimed, also used it as their property, and claimed to be in possession, frequently renting fishing and other privileges.

The deed from Muse's devisees to Washington Berry was rejected as evidence; and the record of the chancery suit divesting Taliaferro's heirs of the legal title was also rejected.

The plat of the town by which the lots were sold, and as we understand the evidence, shows, that, between Front street and the bank of the river, there was a rather crescent-shaped piece of ground, which was also dedicated as a common, but which did not include the sand-bar; and it is admitted in the record that the sand was taken from that part of the bar not included in the deed of trust from Berry and McArthur to Taliaferro. Besides, by section 5 of the act approved March 1, 1848, incorporating Jamestown, and authorizing a sale of lots, in which said deed of trust, for the purpose of holding and conveying the legal title to the lots, by Berry and McArthur to Taliaferro, was recognized, "the said proprietors

*reserve to themselves all ferry rights in front of said town,
and all other rights and immunities which they are by law
entitled to, and which they have not heretofore disposed of.*"

As the sand was taken from land not included in this
deed of trust, it is not necessary for us to investigate
the objects and legal effect of that deed, nor whether,
as the specific trusts had been performed, and, since
Taliaferro's death, another trustee has been appointed
in his stead by order of court, the legal title still con-
tinues in his heirs or has passed out of them. It is said
to be rejected because, in a suit to obtain the legal title,
all of Taliaferro's heirs were not served with process;
but if it be conceded that they still held the legal title,
and were essential parties, we apprehend it was good
as against those who were served. But, in a subsequent
suit by Tompkins to foreclose a mortgage to him by Mc-
Arthur, a partition and conveyance was made, allotting
to Jas. T. Berry, appellant's ancestor, this sand-bar in
controversy; and the then trustee, appointed as Talia-
ferro's successor, was a party to the suit; so, whatever
legal title Taliaferro may have once had, none remained
in his heirs after these various proceedings.

It is insisted that there is no proof that those convey-
ing to Washington Berry, as Muse's *devisees, " were his
heirs,"* and that there is no sufficient description of the
land in their deed. It was certainly not essential that
devisees should be heirs-at-law. If they were devisees,
that would be sufficient. But if it was meant that their
identity as devisees was not made out, we apprehend
that, after a lapse of near three quarters of a century
under a deed, it would seem rather late to require proof
as to the character of the vendors or the identity of the
land; but, in this action, we suppose it at least was com-
petent to show the character and extent of the holding.

But as the possession was of the only character of which this land was susceptible, and fully made out by the parol proof, no peremptory instruction should have been given to the jury to find against the plaintiff, unless that holding was tortious, and that it cannot be if this land could be private property; therefore, the important and controlling inquiry involves the question whether it was or could be private property appendant to Taylor's original patent.

There is only one view in which the Kentucky patent to Mrs. Alice Berry could be important, and that is, if the land between high and low water lines is susceptible of being granted by the State, but was excluded by the Virginia patent to Taylor, then it belonged to Kentucky, as inheriting the sovereign rights of Virginia, and could pass by her grant.

But we return to the main question. It is insisted that the Ohio river is a public navigable stream, and, therefore, no part of its bed is to be presumed as granted to private persons, but belongs to the public at large; because, as the tide ebbs and flows in all the rivers of England, and none or but few waters there, are navigable, except tide-water, that therefore navigable rivers were correctly described by the common law to be those in which the tide ebbed and flowed; but that navigability is the principal thing, the flowing of the tide but a mere incident. When, therefore, we find here other navigable waters, the flowing of the tide being no test, the same consequences, properties, and incidents attach as are given by the jurists of England to its navigable waters, whatever may be the new definitions.

To this it may be replied, that however the courts of the United States may regard navigation and commerce as the controlling elements in testing their admiralty

jurisdiction, and founding this, not upon tide-water, but navigation and commerce, yet, in testing the rights of riparian owners, they recognize the common law distinction between tide water and fresh water in its fullest, broadest sense.

It may be said that so long as the ocean keeps its bed, and nature's present frame shall continue to exist, there will always be water up to the ocean's level in all those channels where the tide ebbs and flows, and this not dependent upon the water falling in rain; therefore, these channels are filled to ocean's level twice every twenty-four hours, and are constantly and uniformly navigable. Their navigability does not depend upon a season more or less rainy, but on the constant, unvarying laws of nature, and will remain as surely navigable as the sea itself. Though not so deep, their surface level is the same; hence, without violence of expression or idea, they are called " arms of the sea."

But it is different with all the great rivers of the earth above tide-water. These are dependent for their supply from the clouds. The Ganges, Nile, Danube, Amazon, Rio Plata, Del Norte, St. Lawrence, Mississippi, and the Ohio, would soon be but stagnant pools or present dry beds but for their supply from rain. It is ascertained that over three hundred inches in depth of rain annually falls on the eastern slope of the South American continent; hence its system of magnificent rivers, nowhere else to be found.

On our own continent, where the annual average of rain is to the depth of forty inches, we have a system of noble streams, navigable for thousands of miles into the interior, among the most important of which is the Ohio; whilst in the north of Africa but little or no rain falls, and it has no rivers, save the Nile, the source of which is

beyond those rainless regions, and recently discovered to be a great interior lake    But, as matters of geography as well as of law, there are fresh water rivers in England, which have been navigable above tide-water for centuries past, and in which the riparian rights of the owners of the soil were recognized and defined.

In Sir Matthew Hale's treatise, in the volume entitled "Hargrave's Law Tracts"—the first four chapters of which are to be found in the notes to 6 *Cowen*, 536–43—in chapter 1 he says: "Fresh rivers, of whatsoever kind, do of common right belong to the owners of the soil adjacent, so that the owners of the one side have, of common right, the property of the soil, and, consequently, the right of fishing, *resque filum aquæ*, and the owners of the other side the right of soil or ownership, and fishing into the *filum aquæ* on their side."  "If a fresh river between the lands of two lords or owners do insensibly gain on one side or the other side, it is held that the propriety continues as before in the river."  "Though fresh rivers are, in point of propriety, as before, *prima facie*, of a private interest, yet, as well fresh rivers as salt, or such as flow and reflow, may be under these two servitudes, or affected by them, viz: one of prerogative, belonging to the king, *and another of public interest, belonging to the people in general.*"

In chapter 2, the one of prerogative, "that no man may set up a common ferry for all passengers, without a prescription, time out of mind, or a charter from the king;" and though he may set up a ferry for his own use and that of his family, yet he may not do so for all the king's subjects, and charge them at his own pleasure; for the king claims to put such under a public regulation, "that it give attendance at due times, keep a boat in due order, and take but reasonable toll."

Also an interest of jurisdiction, "in reference to common nuisances in or by rivers;" and another part of

the "king's jurisdiction in reformation of nuisances; to reform and punish nuisances in all rivers, whether fresh or salt, that are a common passage, not only for ships and greater vessels, but also for smaller, as barges or boats; to the obstructions or annoyances that are therein to such common passage; for, as the common highways on the land are for the common land passage, so these kind of rivers, whether fresh or salt, that bear boats or barges, are highways by water; and as the highways by land are called *altæ via regia;* so these public rivers for public passage are called *fluvii regales,* and *haut streames le roy; not in reference to the propriety of the river, but to the public use;* all things of public safety and convenience being in a special manner under the king's care, supervision, and protection."

In chapter 3, the one of public interest as to "rivers, as well fresh as salt, that are of common public use for carriage of boats and lighters; and these, whether they are fresh or salt, whether they flow or reflow, or not, are *prima facie publici juris,* common highways for man and goods, or both, from one inland town to another. Thus the rivers of *Wey, of Severn, of Thames,* and divers others, as well above the bridges and ports as below; as well above the flowings of the sea as below, and as well where they have come to be private property as in what part they are of the king's propriety, are rivers *juris publici;* and, therefore, all nuisances and impediments of passage of boats and vessels, though in the private soil of any person, may be punished by indictment and removed; and this was the reason of the statute of *Magna Charter, cap. 23.*"

"These kinds of nuisances were such as hindered or obstructed the passage of boats, as weirs, piles, choking up of passage with filth, diverting of the water by

cuts or trenches, decay of banks or the like; and they were reformed, sometimes by indictment or presentment in the leets, sessions of the peace, oyer and terminer, or before justices of assize, oftentimes in the king's bench, for nuisances in the rivers Trent, Ouse, Severn, Leigh, and generally in all other rivers, within the bodies of counties, which had common passage of boats or barges, whether the water were fresh or salt, the king's or a subject's."

Thus, at a very early period, the common law of our British ancestors fully recognized the proprietorship of the owners of the soil to the middle of the main channel of fresh water rivers, which were recognized as public highways, and in which the public had the unobstructed right of navigation, and with which the owner of the soil could in no manner interfere; yet he had many private and riparian rights, indeed every right which did not interfere with the people's right of navigation and commerce.

This riparian right of gain is founded upon this strong equity, that, as the owners of the land adjoining rivers must suffer the loss by the wasting and diluvian of their soil, so they are entitled to the gains by accretion; that, as the government does not warrant the patentee against losses, so it will not claim the gains to his lands; for it is but equitable and mutual, that as he must run the hazard of loss, so he should be entitled to the chances of gain.

The English common law, which our ancestors brought with them to this continent, recognized the land granted on a fresh water river as extending to the thread of the main channel, unless the words of the grant excluded this, whilst the rule was different on all those rivers, or that part of the river, subject to the ebb and flow of the sea, or, in other words, a different rule prevailed at that

point it ceased to be a fresh water and became a salt water river.

That learned commentator, Chancellor Kent (*in 3d volume Commentaries*, 527, *Comstock's edition*), commenting on riparian rights, says: "That, by the common law, the right of soil of owners, bounded by the sea, or on navigible rivers, where the tide ebbs and flows, extends only to ordinary high water mark, and that the shore below belongs to the State, as trustee for the public; and that in England the crown, and in this country the people, have the absolute proprietary interest; though it may, by grant or prescription, become private property, still the public have a common law right to navigate over every part of a common navigable river, and on the lakes, for the sovereign is trustee for the public, and the use of navigable waters is inalienable; and that the shores of navigable waters, and the soil under them, belong *to the State* in which they are situated, as sovereign, and the right of sovereignty in public rivers, above the flow of the tide, is the same as in tide-waters; and that they are *juris publici,* '*except that the proprietors adjoining such rivers own the soil, ad filum aquæ.*' But grants of land, *bounded on rivers, or upon the margin of the same, or along the same,* above tide-water, *carry the exclusive right and title of the grantee to the center of the stream,* unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river; and the public, in cases where the river is navigable for boats and rafts, have an easement therein, or right of passage, subject to the *jus publicum,* as a public highway. *The proprietor of the adjoining banks have a right to use the land and water of the river,* as regards the public, *in any way not inconsistent with the easement.* 	*	*

It would require an express exception in the grant, or

some clear and unequivocal declaration, or certain and immemorial usage, to limit the title of the owner, in such cases, to the edge of the river. *Where a stream is used in a grant as a boundary or monument, it is used as an entirety to the center of it, and, to that extent, the fee passes.* \* \* \* \* If a fresh water river, running between the lands of separate owners, insensibly gains on one side or the other, the title of each continues to go *ad filum medium aquæ.* \* \* \* \* This is the general doctrine as to alluvians. If soil be formed by islands, or relicted land out of the sea or a river, by slow and imperceptible accretion, it belongs, in the case of the sea or navigable rivers, to the sovereign; and in cases of rivers not navigable in the common law sense of the term, *or above where the sea ebbs and flows, it belongs to the owners of the adjoining lands.*"

And this has been the recognized rule of a very large majority of the American States, touching almost every important river of the continent, and embracing nearly every State bordering on the Ohio and Mississippi rivers, including Virginia.

As this was a Virginia patent, issued before the separation of Kentucky from her, the rights of the patentee vested under the laws of Virginia, and are protected by the compact between her and her daughter, Kentucky; and to deprive him or his vendees of any rights acquired by her patent, or to circumscribe the boundaries within narrower compass than did her laws, is a violation in spirit and letter of said compact, which is now made of constitutional sanction and sacredness, and which expressly provides (*sec.* 7), that all private rights and interest of lands derived from the laws of Virginia prior to such separation shall remain valid and secure, and be determined by the Virginia laws.

MAINE.—*Morrison vs. Keen*, 3 *Greenl.*, 474; *Brown vs. Chadbourne*, 31 *Maine*, 9.

MASSACHUSETTS.—*Storer vs. Freeman*, 6 *Mass.*, 439; *King vs. King*, 7 *Mass.*, 496; *Lunt vs. Holland*, 14 *Mass.*, 149; *Hatch vs. Dwight*, 17 *Mass.*, 289.

NEW HAMPSHIRE.—*Claremont vs. Carleton*, 2 *N. H.*, 369; *Greenleaf vs. Ketton*, 11 *N. H.*, 531.

CONNECTICUT.—*Adams vs. Pease*, 2 *Conn.*, 483; *Warner vs. Southworth*, 6 *Conn.*, 471.

NEW YORK.—3 *Caine's*, 307; 17 *Johnson*, 195; 20 *Johnson*, 90; 6 *Cowen*, 518; 5 *Paige*, 137–547; 5 *Wend.*, 447; 13 *Wend.*, 358; 17 *Wend.*, 571; 20 *Wend.*, 111; 22 *Wend.*, 425; 26 *Wend.*, 404, *and others*.

NEW JERSEY.—1 *Halstead*, 1; 3 *Zabriskie*, 624.

MARYLAND.—*Brown vs. Kenady*, 5 *Ham. & J.*, 195.

VIRGINIA.—*Hays' ex'r vs. Bowman*, 1 *Rand.*, 417; *also*, 3 *Rand.*, 33.

NORTH CAROLINA.—*Hammond vs. McGlaughlin*, *Taylor's Rep.*, 84.

ALABAMA.—*Hagan et ux. vs. Campbell*, 8 *Por.*, 9.

GEORGIA.—*Young et ux. vs. Harrison et ux.*, 6 *Geo.*, 141; *Jones vs. Water Lot Co.*, *Columbus*, 18 *Geo.*, 539.

MISSISSIPPI.—*Morgan et ux. vs. Reading*, 3 *Smedes & M.*, 366.

LOUISIANA.—*Morgan vs. Livingston*, 6 *Mar.*, 216; *Municipality No. 2 vs. Cotton Press*, 18 *La. R.*, 122; *same*, 278.

TENNESSEE.—*Stuart vs. Clark's less.*, 3 *Swan*, 9; *Overruling Elder vs. Benson*, 6 *Hemp.*, 358.

ILLINOIS.—*Middleton vs. Pritchard*, 3 *Scam.*, 510.

WISCONSIN.—*Jones vs. Pettibone*, 2 *Wis. R.*, 308.

OHIO.—*Young vs. McEntire*, 3 *Ohio*, 495; 11 *Ohio*, 138; 16 *Ohio*, 540.

Also, including the decision of the Supreme Court of the United States (*Handley's lessee vs. Anthony et al.*, 5

*Wheat.*, 374.), in which it decided that Virginia had ceded all the land from the Ohio river at ordinary low water on its north, and that the accretions on the north bank in Indiana belonged to her jurisdiction, and were subject to her laws.

And in *Jones vs. Soulard*, decided by the supreme court, December, 1860 (*see* 24 *How.*, 63.), it appeared that St. Louis, Missouri, was incorporated in 1809, by an order of the common pleas court for the district of Louisiana, the eastern boundary being from the last call on the river; "*thence by the Mississippi to the place first mentioned*," the beginning being on the river. That June 13, 1812, Congress confirmed the titles of the inhabitants of out lots, village lots, &c., which were to be surveyed; and enacted also that all town or village lots, out lots, or common field lots, included in such survey, which do not rightfully belong to individuals, nor held as commons, or such as shall be reserved by the President of the United States for military purposes, are reserved for the support of schools as aforesaid.

In 1812, there was a naked sand-bar in the river, near the town, which was then surrounded on all sides by fresh water—navigable, in fact, for the crafts usually navigating the river, and was covered by ordinary high water, when the river was within its banks; that it continued so, and unfit for cultivation, until after Missouri was admitted into the Union; that it was part of an island, known as Duncan's, which was formed by said sand-bar, after the admission of the State; and that they were always west of the main channel of the river; and if the boundary is to be construed as extending to the middle of the main channel, are within township forty-five north, range seven east, of the fifth principal meridian, and within the assignment to the

schools and out-boundary directed to be run by the act of 1812, if said boundary is also to be construed as extending to the middle of the main channel; that it was also within Duncan's pre-emption entry; and that, by subsequent acts, it had been surveyed and reported as the northern half of United States survey four hundred and four, of the St. Louis series of school lands, in 1836, and reported as being within the city of St. Louis as it stood incorporated in 1812; and it was included in the city block eight hundred and seventy-three.

In 1831, Congress had relinquished to the State the title to all lots reserved for school purposes, to be sold and controlled for such purposes by it.

In 1833, the State Legislature created a school corporation, and vested in it the title and control of these lots and lands, and Soulard held their title as vendee.

Jones, as vendee of Duncan, claimed—

1. Under an entry made by Robt. Duncan, in 1835, including the sand-bar, but which had been canceled by the Commissioner of the General Land Office as illegal.

2. Under an act of the State Legislature of 1851, transferring the title of Duncan's island, including this sand-bar, to the city of St. Louis, which title he held as its vendee.

This land, upon which St. Louis was originally laid out, belonged to the United States, consequently, the direct and immediate and controlling question was, whether the title of the government extended to the middle of the main channel, and was embraced in the river boundary of the town as originally described, and whether this accretion became an out-lot of the town, reserved for school purposes, and the title to which passed, by the Congressional act of 1831, to the State

for school purposes, and was vested in the school corporation created by the State enactment of 1833, and passed by this corporation to Soulard; or whether it was to be governed by the common law rules applicable to tide-water and navigable rivers, and the title to the lands below high water line, presumed to be reserved by the sovereign; and, if so, the United States, not having parted with the title until Missouri became a State of the Union, the title thereto vested in her as the sovereign, and passed to the city by her enactment of 1851, and was vested in Duncan as her vendee, and passed by his deed to Jones.

In. reference to whether grants of land, bounded by fresh water rivers, where the expressions designating the water-line are general, confer the proprietorship on the grantee to the middle thread of the stream and entitle him to the accretions, the court said:

"We think this, as a general rule, too well settled as part of the American and English law of real property, to be open to discussion; and the inquiry here is, *whether the rule applies to so great and public a water-course as the Mississippi is, at the city of St. Louis?* The land grant to which the accretion attached has nothing peculiar in it to form an exemption from the rule; it is an irregular piece of land of seventy-nine acres, found vacant by the Surveyor General, and surveyed by him as a school lot, in conformity to the act of 1812."

. "The doctrine that, on our rivers, where the tide ebbs and flows, grants of land are bounded by ordinary high water mark, *has no application in this case, nor does the size of the river alter the rule.* To hold that it did, *would be a dangerous tampering with riparian rights,* involving litigation concerning *the size of rivers as matter of fact, rather than proceeding on established principles of law.*"

The court proceeds then to determine that the city charter of 1809 extended to the middle of the main channel of the river; and that Soulard held the legal title, and that Jones' title was unavailing. It is hardly necessary to say that this adjudication by the Supreme Court of the United States is a full response to all that part of appellee's argument, insisting that this construction would violate various acts of Congress relative to the Mississippi river and its tributaries.

In *Banks vs. Ogden* (2 *Wallace*, 67), the Supreme Court of the United States held, where the proprietor to an addition to the city of Chicago had laid off a street to the water line on the lake, that he retained the legal title to half the street next the water, subject to the public use of the street, and was entitled to the accretion of more than one thousand eight hundred feet, made by the lake, and apply the common law rules relative to the rights of owners on fresh water streams to these truly great inland seas.

If the riparian owner is entitled to the accretions made on the shores of these great basins of fresh water, containing thousands of square miles, without current or tide, and the depths of which are, in many places, almost beyond soundings, navigated by the character of vessels and appliances known to the seas and oceans, their cities and ports partaking of the character of the maritime ports of the great highways of the world, it is hard to perceive why the riparian owner should not be entitled to the accretions on our rivers, rarely more than a mile, and perhaps never over two miles in width; nor is there anything in this construction inconsistent with the compact between Virginia and Kentucky for the Ohio river, notwithstanding the title of the riparian owners to the thread of the main channel of the stream

must always remain a public navigable highway, and the *use* thereof free to all the citizens of the States of the Union, and the riparian owner holds subject to these uses; but this public right to use the river does not include the right to dig, use, and transport the soil or sand of its banks, nor in any manner to infringe upon the private legal rights of the riparian owner, not subordinated to the public use of the river for purposes of commerce and navigation.

Whatever, therefore, may be the rights of the trustees and citizens of Jamestown, under the license of the original proprietors, to enter upon this sand-bank for the use of buildings, &c., erected in the town, they have no right to dig and transport this sand to other markets, and, consequently, could license no one else to do so, unless, by some means, they have become possessed of Berry's title thereto.

The terms of the original grant by Virginia to James Taylor do not exclude the land between ordinary high water mark and middle of the main channel; therefore, the grant conveyed the land to the middle of the main channel of the river, and, consequently, all accretions belonged to the riparian owner as an incident to his title.

We are not apprised that this question has ever before been directly presented to, or decided by, this court, yet we think the principle accords with the common law, is sustained by the overwhelming majority of the American States, though among these there is some conflict, and by a series of unbroken decisions of the Supreme Court of the United States; and when we regard the dignity, ability, and integrity of this court, and the national character of these great internal fresh water rivers, we must receive its decisions as of the highest

and most respectable, if not binding, authority; and, before we would depart from its adjudications upon this question, and as to these rivers, would require demonstration that. it had departed from authority and principle.

After elaborate and able argument for each party, this case was first submitted at the December term, 1866. The court, after consideration, determined to order a reargument for the June term, 1867; but it was then continued until the present term, when it was again elaborately argued. Thus, after two arguments, and a year's consideration and investigation, a · majority of the court have come to a deliberate and not hasty or inconsiderate determination (Judge ROBERTSON dissenting).

As various errors were committed, and several departures from the principles of this opinion, the ·judgment is reversed, with directions for a new trial and further proceedings conformable herewith.

JUDGE ROBERTSON, NOT CONCURRING IN THE REASONING OF THE MAJORITY OF THE COURT, DELIVERED THE FOLLOWING SEPARATE OPINION:

According to the common law of England, maritime jurisdiction over its rivers emptying into the sea does not extend higher than the ebb and flow of the tide, and the riparian rights of the owners of land bounded by its rivers below tide-water do not extend beyond ordinary high water-mark; but, above tide-water, extend to the middle of the river, " *ad medium filum aquæ.*"

The only reason for that anomalous and apparently incongruous doctrine is, that the periodical ebb and flow of the tide twice in twenty-four hours require that the facility and security of navigation should not be disturbed by private ownership of the shores between high and low water-mark, which, therefore, is held to be *jus publicum;* and that, as the rivers of that country, comparatively small, short, and shallow, above tide-water, are not fit for general or useful navigation as commercial streams, they are not deemed, for practical use, navigable; and, therefore, in that country tide-water and navigability are considered synonymous, and no river above the ebb and flow of the tide is deemed or called a navigable stream. This doctrine is local, and is not American. Consequently, the Supreme Court of the United States, in the case of *Genessee Chief et al. vs. Fitzhugh et al.*, 12 *Howard*, 454, said: " There is certainly nothing in the ebb and flow of the tide that makes the water peculiarly suitable for admiralty jurisdiction, nor anything in the absence of a tide that renders it unfit. If it is a public navigable water on which commerce is carried on between different States or nations, the *reason* for the jurisdiction *is precisely the same;* and, if a distinction is made on that account, it is *merely arbitrary, without any foundation in reason, and, indeed, would seem to be inconsistent with it.*

"In England, undoubtedly, the writers on the subject and the decisions of its courts of admiralty always speak of the jurisdiction as confined to tide-water; and this distinction in England was a sound and reasonable one, *because there was no navigable stream in that country beyond the ebb and flow of the tide,* nor any place where a port could be established to carry on trade with a foreign nation, and where vessels could enter or depart with cargoes. *In England, therefore, tide water and navigable water are synonymous* terms; and tide-water, with a few small and unimportant exceptions, meant nothing more than public rivers as contradistinguished from private ones; and they took the ebb and flow of the tide as the test, because it was a convenient one, and more easily determined the character of the river. Hence the established doctrine in England, that the admiralty jurisdiction is confined to the ebb and flow of the tide; in other words, it is confined to public navigable waters.

"At the time the Constitution of the United States was adopted and our courts of admiralty went into operation, the definition which had been adopted in England was equally proper here. In the old thirteen States, the far greater part of the navigable waters are tide-waters; and in the States which were at that period in any degree commercial, and where courts of admiralty were called on to exercise their jurisdiction, every public river was tide-water *to the head of navigation.*

"And, indeed, until the discovery of steamboats, there could be no foreign commerce upon waters with an unchanging current resisting the upward passage. *The courts of the United States, therefore, naturally adopted the English mode of defining a public river,* and, consequently, the boundary of admiralty jurisdiction. It measured it by tide-water; and that definition having found its way

into our courts, became, after a time, the familiar mode ·of describing a public river, and was repeated as cases occurred, *without particularly examining whether it was as universally applicable in this country as it was in England.*

"If there were no waters in the United States which are public as contradistinguished from private, except where there is tide, then, unquestionably, here, as well as in England, tide-water must be the limit of admiralty power; and as the English definition was adopted in our courts, and constantly used in judicial proceedings and forms of pleading adopted from England, the public character of the river was, in process of time, lost sight of, and the jurisdiction of the admiralty treated as if it was limited by the tide. The description of a public navigable river was substituted in the place of the thing intended to be described; and, under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on *after it had ceased, from a change of circumstances, to be the true description of public waters.* It was under the influence of these precedents and this usage that the case of the *Thomas Jefferson,* 10 *Wheaton,* 428, was decided in this court, and the jurisdiction of the courts of admiralty of the United States declared to be limited to the ebb and flow of the tide."

For the reasons thus given the court, in a lucid opinion delivered by Chief Justice Taney, overruled the case of the Thomas Jefferson, and then added:

"*It is evident that a definition that, at this day, limits public rivers in this country to tide-water rivers, is utterly inadmissible. We have thousands of miles of public navigable water, including lakes and rivers, in which there is no tide. And certainly there can be no reason for admiralty power over a public tide-water, which does not*

apply with equal force to any other public water used for commercial purposes and foreign trade."

The facts and reasoning which, in this opinion, modify the common law, which, *in this branch of it, was local in its* operation, and, in its reason, applied only to England, must be as strong, and even stronger, in respect to riparian rights in this country.

The New England States adopted the common law of England *just as it was recognized in that country*, and for that reason, as well as for the reason suggested in 12th Howard, *supra*, they have generally adhered to the English doctrine as to riparian rights.

But *Virginia* and her first offspring, *Kentucky*, adopted the common law *only so far as the reason of it was applicable to their local circumstances*. And, so far as we know, neither of these States has ever applied the common law to any of their large navigable rivers above tide-water. And the same reasons that induced Kentucky to repudiate the feudal doctrine in "*Shelly's* case," as totally uncongenial with our institutions, though blindly adopted elsewhere, ought to induce this court to decide that the *Ohio* is a public navigable stream, and that riparian proprietors of land bounded by it have no more rights than the same class enjoy in England on tide-water rivers, which are there, for peculiar reasons, called the only navigable waters in the kingdom.

For such cogent reasons as these, the States of *Pennsylvania, North Carolina, South Carolina, Georgia, Alabama, Tennessee, and Iowa* have so decided in relation to their large navigable rivers above tide-water. But several other States have obsequiously recognized the common law, without seeming to have considered its local reason, altogether inapplicable in America, and inconsistent with every reason here. After a long and varying conflict

among her courts and most eminent jurists, New York, which has decided both ways, seems at last, by its latest decisions, to have followed the common law, but with exceptions and qualifications which neutralize her authority; for her courts have sustained, against riparian claims, grants of islands in, and beds under, some of her navigable rivers, and, without dissent, have adjudged that riparian owners on the lakes, and even the *Niagara river*, where there is no tide-water, have no title beyond the banks.

Chief Justice Taney's reasoning in the case in 12 *Howard*, shows how those courts which applied the common law to large rivers, navigable above the ebb and flow of the tide, lapsed blindfolded into that absurdity; and that reasoning, and the conclusion of the court in that case, apply fully and even more obviously to this case. The absurdity of a contrary doctrine may be sufficiently illustrated by a single example. The Supreme Court of the United States has decided that the tide ebbs and flows from the gulf as high up the Mississippi river as about the city of New Orleans. Then, how arbitrary and even ridiculous would it be felt to be, for a court to adjudge to the owner of land on that river, just above the city, the bottom of the river *ad filum aquæ*, with all its mineral wealth, and, at the same time, decide that an owner of land on the same river, just below the city, although he paid to the sovereign the same price, must be nevertheless restricted to high water-mark? And who can answer why this can be so? The same reason applies to each case, and the same principle should govern both.

On such subjects especially American law should be homogeneous; and it can never be harmonized into an American system of national jurisprudence, until courts look, more than many of them have ever done, to the

reason of so much of the common law as is arbitrary, local, or *un-American*.

Why should the common law as to English rivers be applied to the *Amazon*, the *Mississippi*, and the *Missouri*, actually navigable, and constantly navigated, by steamboats for thousands of miles? In 'the opinion delivered by Justice Catron, in *Jones vs. Soulard* (24 *Howard, p*. 65), it said, that " the doctrine that, on rivers where the tide ebbs and flows, grants of land are bounded by ordinary high water-mark, has no application in this case. To hold that it *did*, would be a dangerous tampering with riparian rights (begging the question), involving litigation concerning the size of rivers (not more debatable than the end of the tide) as matter of fact, rather than proceeding on established law." " Many authorities, resting on the adjudged cases, have been adduced to us in the printed argument presented by the counsel of the defendent in error, to show that, from the time of Sir Matthew Hale to the present time, all grants of land bounded by fresh water rivers confer the proprietorship on the grantee to the middle thread of the stream. We think this, as a general rule, is too well settled as part of the American and English law of real property to be open to discussion; and the inquiry here is, whether the rule applies to so great and public a water-course as the Mississippi at St. Louis."

As already shown, neither authority nor reason settles this as the *American* rule; and the case in 12*th Howard* proves that it neither is nor ought to be so settled. By what cases has this doctrine been settled? Only in some States that adopted the common law without stint or qualification. But the reason and operation of this branch of the common law are uncongenial with the condition of this State; and, being therefore excepted

by the ordinance adopting the common law in a modified form, was never the common law here. What common law did Judge Catron mean? The Federal Government having no common law, he meant only such as some of the States had adopted without question or diminution.

The assumptions in 24th *Howard* are unauthorized, and some of them suicidal; and, against preponderating reason and authority, cannot be recognized as any authority, and especially in Kentucky, which not only never adopted this excrescence on the bosom of American law, but repudiated it as fungus. It is idle to cite decisions in States that adopted the common law without exceptions; Kentucky has no such common law on this subject. As to that, her only common law is common sense—consistent, discriminating, self-poised, common sense. When and how did the local doctrine I am combatting ever become the common law of Kentucky, as of some other States? The question cannot be answered; and the idea here merely suggested is indisputable and impregnable. This seems to be conclusive.

Kentucky owns the Ohio river on its border, and low water-mark on the opposite shore is its northern limit; and, according to *Kent,* if a grantee of land on the Ohio is bounded by ordinary low water-mark, he will hold to low-water mark on the opposite side—that is, the whole river will be the boundary, and the grantee will be entitled to all islands formed in the river by accretion or eruption.

It cannot be accredited, either, that Virginia, when she granted to Taylor the land on the Ohio, intended to grant away the bed of the river or one half of it, or that the grantee so understood or expected; and if such was the

legal result, it is strange that no such riparian claim was ever established or asserted until in this case.

The constant and unvarying periodicity of the ebbs and flows in tide-water streams, is the only reason why grants of land on them are limited by high water-mark. That reason does not apply to navigable fresh water rivers, which depend, for their volume of water and accidental width, on the fluctuating and uncertain seasons, wet and dry; and, consequently, this court has often adjudged that the owner of land on the Ohio river goes to ordinary low water; and this is the rational and only consistent doctrine, and it impliedly settles this case.

As there can be no river without a bed and banks, the water, the bed, and the banks, constitute the river, and each element is indispensable to its existence. Therefore, there can be no owner of the bed of a navigable river, unless it shall have been expressly and specifically granted to him. Of such a thing there can be no constructive ownership. The Commonwealth is presumed to retain the title to the whole river, in its ordinary state, for the use of the public, until she shall make, as she may, a specific grant of some portion of it to private use. This is a settled doctrine of the common law, and is equally applicable to all navigable rivers.

The civil law rule, more comprehensive in its range and universal in its principle than the local rule in England, applies to fresh water as well as salt water streams, that are, in fact, internationally navigable, and restricts the title of riparian owners on all navigable waters to high or low water-mark, without a special grant by the sovereign of the bed of the stream; and this is the only reasonable doctrine for America, with its large fresh water streams, navigable by steamboats.

And in *Bowman et al. vs. Wathen et al.*, 2d *McClean*, 376, Justice McLean said: "We apprehend that the common law doctrine as to navigableness of streams can have no application in this country; and that the fact of navigableness does, *in no respect*, depend upon the ebb or flow of the tide. On navigable streams the riparian right, we suppose, cannot generally extend beyond high water-mark."

In the cases of *Bruce vs. Taylor*, 2 *J. J. Marshall*, 160; *City of Louisville vs. Bank of the United States*, 3 *B. Mon.*, 143; *Morrison vs. Taylor*, 14 *Ib.*, 367, *and* 17 *Ib.*, 249, this court intimated the same doctrine.

The grant by *Virginia* in April, 1787, to James Taylor, of one thousand acres of land, calls to begin *at three trees on the bank* of the Ohio, and to run *up its meanders*. It contains no allusion to the bed of the river, nor any intimation that the bed or any of it was granted to Taylor; and, consequently, there was, in that patent, no specific grant of any of the ordinary bed of the river; and none, therefore, should be constructively recognized. But, as a necessary consequence of the foregoing view of the law, the Commonwealth of Kentucky still owned the bed of the river, and islands and sand-bars, so far as the latter did not result to Taylor, or those claiming under him, as an accretion to the land granted to him. When the patent for the sand-bar in this case was issued to Alice Berry, there was no such alluvial accession; and, consequently, in my opinion, her patent for the sand-bar vested in her the exclusive legal title to it; and these views as to the common law in Kentucky seem to have been recognized by the circuit court.

In my judgment, therefore, it was not necessary in this case to decide whether the patent to Taylor, under which the appellants also claimed, extends to the middle

thread of the river or only to low water-mark; and, consequently, wanting time for the full and thorough investigation which such a question eminently deserves, I preferred to forbear an unnecessary decision, by a divided court, of a doctrine so important and hazardous as that of the constructive extent of Taylor's grant. I considered it much more prudent to await a case in which the decision of that question would be judicially necessary, and might be more authoritative and satisfactory. But the majority of the court choosing a different course, the only alternative left me is to withhold my concurrence in a doctrine which they, for the first time in Kentucky, recognize and apply; and, unexpectedly placed in this embarrassing predicament, I felt it my duty to the country, as well as to myself, to suggest, *raptim et carptim*, some of the reasons for my dissent; and, though I have been compelled to perform this unwelcome task in a hasty, crude, and very imperfect manner, yet I feel assured that I am right, and now rest, with entire self-satisfaction, on this desultory sketch of my own opinion.